UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT J. SEARLE and <br> SUSAN SEARLE, <br><br> Plaintiffs, <br><br> v. <br><br> RBS CITIZENS, N.A., DITECH <br> GREENTREE FINANCIAL, and HARMON <br> LAW OFFICES, P.C., <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * Civil Action No. 17-cv-10427-ADB <br> * <br> * <br> * <br> * <br> * <br> * |

**MEMORANDUM AND ORDER ON**
**MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO DISMISS**

BURROUGHS, D.J.

Plaintiffs Robert and Susan Searle bring this action against RBS Citizens, N.A. ("Citizens") and Ditech Financial LLC, formerly known as Green Tree Servicing LLC ("Ditech/Green Tree") (collectively "Defendants"), in an attempt to avert the foreclosure of their home located at 9 Prospect St., Merrimac, Massachusetts. Plaintiffs claim that Defendants failed to respond to their requests to produce certain documents related to the mortgage, and thus violated (1) the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e)(1)(A) and (B), and Regulation X at 24 C.F.R. § 3500; (2) the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692(a); and (3) the Truth in Lending Act ("TILA"), 15 U.S.C. § 1640(a)(1) and (2). [ECF No. 19]. Currently pending are Plaintiffs' motion for leave to file a Second Amended Complaint and motion for a preliminary injunction to prevent the foreclosure of the property, and Defendants' motion to dismiss. [ECF Nos. 21, 22, 26].

For the reasons stated herein, the motion for leave to file a Second Amended Complaint and motion to dismiss [ECF Nos. 21, 22] are <u>GRANTED</u> and the motion for a preliminary

injunction [ECF No. 26] is DENIED.

I.       FACTUAL AND PROCEDURAL BACKGROUND[1]

On June 10, 2005, Plaintiffs took out a $50,000 home equity line of credit[2] from First Horizon Home Loan Corporation. [ECF Nos. 26 at 1, 26-1 at 23].[3] The line of credit served as a second lien behind their original mortgage. [ECF No. 26-1 at 2]. The agreement that governed the line of credit stipulated that the initial interest rate would be 6.5%, with a five-year draw period. After the end of the draw period, the loan would go into a fifteen year repayment period with a fixed interest rate, during which time the Plaintiffs were to make a monthly payment of principal plus interest. [ECF No. 26 at 1].

Plaintiffs allege that as the end of the draw period approached, they realized that their new payment was not going to be affordable. [ECF No. 26 at 1]. By then, Plaintiffs had both lost their jobs and were struggling financially due to their reduction in income. Id. Because of this, for the first ten months after the loan converted to a fixed rate loan, they continued to make "interest only" payments, even though the agreement required them to pay interest plus principal. Id. Along with each "interest only" payment made over the ten-month period, Plaintiffs sent

---

[1] The following facts are set forth in the Amended Complaint and Second Amended Complaint. In considering the merits of a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. Speleos v. BAC Home Loans Servicing, L.P., 824 F. Supp. 2d 226, 230 (D. Mass. 2011).

[2] The line of credit agreement and mortgage may be considered at the motion to dismiss stage because they are publicly recorded, central to Plaintiffs' claims, and referenced in the complaint. See Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 86 (1st Cir. 2008) (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

[3] The Court grants the motion to file a second amended complaint, which the Court has reviewed. See Fed R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). Allowing the motion has no impact on the outcome of this motion to dismiss, because the proposed Second Amended Complaint does not raise any new claims, but merely provides greater detail and clarification.

letters to the lender, Citizens,[4] and the servicer at that time, Green Tree,[5] requesting a loan modification. [ECF Nos. 26-1 at 1–4, 26-2 at 25]. After ten months, the servicer sent a letter to Plaintiffs stating that it "would no longer accept [the] 'interest only' payments and would foreclose on [Plaintiffs' property] if [they] did not pay the monthly [p]rincipal and [i]nterest payment they had requested." [ECF No. 26-1 at 2]. Plaintiffs were persistent in their efforts to research and request a loan modification, including making daily inquiries over a period of several months. Id. at 2–3. Plaintiffs assert that eventually, the servicer advised them that it does not make loan modifications. [ECF Nos. 26 at 2, 26-2 at 17, 29].

In early 2012, Plaintiffs sought the help of the Massachusetts Attorney General's Office, and over the next year, that office assisted Plaintiffs in their efforts to obtain a modification by coordinating communication with Green Tree. [ECF Nos. 26 at 2, 26-1 at 20–22, 26-2 at 11–13, 16]. After some back and forth, Plaintiffs were able to obtain a modification. [ECF No. 26-1 at 3]. In early April 2012, Green Tree sent Plaintiffs documents to modify the interest rate and extend the maturity date of the loan by eighteen months ("the Modification Agreement"). [ECF No. 26 at 3, 26-2 at 2–9]. Plaintiffs claim that, when they reviewed the documents, they realized that the interest rate would actually go up, it was not clear what the monthly payment would be, and the documents were otherwise "shoddy" and "inconsistent." [ECF No. 26-1 at 2–5]. Despite these concerns, however, Plaintiffs signed the Modification Agreement on April 19, 2012. [ECF No. 21-5 at 3].

---

[4] On December 27, 2010, the home equity line of credit agreement was assigned from First Horizon to Citizens. [ECF No. 26-2 at 41]. A copy of the assignment was attached to the complaint. See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) ("Exhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6)" (quoting Fed. R. Civ. P. 10(c))).
[5] On August 25, 2010, the servicing of the home equity line of credit agreement was transferred from First Tennessee Bank National Association to Green Tree. [ECF No. 26-2 at 49].

3

Thereafter, Plaintiffs wrote four letters, which they believed to be "Qualified Written Requests" under RESPA, from November 9, 2014 to November 4, 2016. [ECF Nos. 26 at 4, 26-2 at 2–9]. Plaintiffs sent copies of each letter to the lender, Citizens, and to the servicer. Id. Plaintiffs believed that Citizens and Ditech/Green Tree did not have the legal right to collect payments. In a letter to Green Tree, dated March 28, 2015, Plaintiffs requested, among other items:

- "copies of ALL documents since consummation of the loan to further insure a Validation of Debt with also a Request for Accounting;"
- "an itemized accounting of the 'Corporate Advances' that have been accumulating on each monthly statement and where they derive;"
- "any and all reference to 'insurance' and costs associated with insurance and/or taxes;" and
- "validation of who owns the note and . . . a copy of same along with copy of the assignments from the original note holder to the current note holder."

[ECF No. 26-2 at 5]. On that same date, Plaintiffs requested similar documents from Citizens.[6] Id. at 3–4. Plaintiffs allege that Defendant "failed to comply on all requests," though they also acknowledge that they received replies that contained monthly statements and a "spreadsheet accounting." [ECF No. 26 at 4].

The complaint states that Ditech became the servicer of the loan in late 2015. Id. at 8. The complaint does not describe the relationship between Green Tree and Ditech, or assert that

---

[6] In addition to what they requested in their letter to Green Tree, Plaintiffs also requested that Citizens provide documentation validating its authority to collect or service the loan, loan accounting records, and documentation identifying all other parties' involvement and interest in the loan. [ECF No. 26-2 at 3–4].

4

servicing rights were transferred from Green Tree to Ditech. Defendants clarify that Ditech previously did business under the name "Green Tree Servicing" [ECF No. 21 at 1–2], which Plaintiffs do not dispute.

Plaintiffs contend that they have suffered financially and have been kept in "foreclosure status" for the past seven years. [ECF No. 26 at 9]. They claim that "[c]ontinuing to avoid compliance with this request for pertinent documents has damaged [them] and continues to keep them from moving forward in obtaining financing elsewhere due to the 'Foreclosure Status' they are forced to remain in." Id. at 5. Additionally, Plaintiffs allege that Defendants have "threaten[ed] to foreclose on the property, and provide[d] foreclosure auction dates that encourage the public to visit their home to take pictures." [ECF No. 26-1 at 3]. Furthermore, Plaintiffs assert that many individuals have approached the house, knocked on the door, and asked if they can buy the house, which Plaintiffs claim is a violation of their right to quiet enjoyment. Id.

On March 6, 2017, Plaintiffs filed their initial complaint and motion for preliminary injunction in Essex Superior Court, which requested that the court enjoin Defendants from conducting a foreclosure sale of the property. [ECF No. 28 at 2–3]. On March 15, 2017, Defendants removed the case to this Court [ECF No. 1], and on April 5, 2017, they filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim [ECF No. 9].

On June 23, 2017, with leave of the court, Plaintiffs filed an amended complaint and motion for preliminary injunction. [ECF No. 19]. On July 1, 2017, Defendants filed a motion to dismiss the amended complaint. [ECF No. 21]. On August 2, 2017, Plaintiffs moved for leave to file a second amended complaint. [ECF No. 22]. On August 30, 2017, Plaintiffs filed their proposed second amended complaint and another motion for a preliminary injunction. [ECF No.

26]. On September 11, 2017, Defendants filed a supplemental opposition to Plaintiffs' motion for leave to file a second amended complaint. [ECF No. 28]. Plaintiffs opposed Defendants' motion to dismiss the amended complaint. [ECF No. 29].

## II. MOTION TO DISMISS

### A. Standard of Review

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all well-pleaded facts in the complaint and analyzes those facts "in the light most hospitable to the plaintiff's theory, and draw[s] all reasonable inferences for the plaintiff." United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). Although detailed factual allegations are not required, the complaint must set forth "more than labels and conclusions" to survive a motion to dismiss. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Furthermore, courts are not bound to accept as true legal conclusions couched as factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The facts alleged, when taken together, must therefore be sufficient to "state a claim to relief that is plausible on its face," A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (quoting Twombly, 550 U.S. at 570), and must "raise a right to relief above the speculative level," Twombly, 550 U.S. at 555. A "formulaic recitation of the elements of a cause of action" is not enough. Id. Dismissal for failure to state a claim is thus appropriate "[i]f the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" Lemelson v. U.S. Bank Nat'l Ass'n, 721 F.3d 18, 21 (1st Cir. 2013) (quoting Hutcheson, 647 F.3d at 384) (further internal quotations omitted).

When evaluating the sufficiency of a complaint, the Court first "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." A.G. ex rel. Maddox, 732 F.3d at 80 (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Second, the Court must determine whether the remaining factual content allows a "reasonable inference that the defendant is liable for the misconduct alleged." Id. "Although evaluating the plausibility of a legal claim requires the reviewing court to draw on its judicial experience and common sense, the court may not disregard properly pled factual allegations, even if it strikes a savvy judge that actual proof of those facts is improbable." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (internal quotations and citation omitted).

**B.     Claims Alleged**

Plaintiffs allege that Defendants committed violations of TILA, 15 U.S.C. § 1640(a)(1) and (2); RESPA, 12 U.S.C. § 2605(e)(1)(A) and (B); and the FDCPA, 15 U.S.C. § 1692(a), through their responses, or lack thereof, to Plaintiffs' requests for a loan modification and document production.

1.     TILA Violations

Plaintiffs allege that Defendants violated TILA by failing to provide certain loan disclosures. TILA's purpose is to "assure a meaningful disclosure of all credit terms so the consumer will be able to compare . . . the various credit terms available to him [or her] . . . to avoid an uninformed use of credit, and to protect the consumer against inaccurate [and/or] unfair credit billing practices." 15 U.S.C. § 1601(a). For a home equity line of credit, the creditor must disclose information including the interest rate, fees, minimum periodic payments, and repayment options. See 15 U.S.C. § 1637a. TILA imposes liability on creditors who fail to make

7

the required disclosures, and in limited circumstances, assignees of creditors can also be held liable. 15 U.S.C. §§ 1640(a), 1641(e); Faiella v. Green Tree Servicing LLC, No. 16-cv-088-JD, 2017 WL 589096, at *3 (D.N.H. Feb. 14, 2017) (assignee liable if violation is apparent on face of disclosure statement), appeal docketed, No, 18-1063 (1st Cir. Jan. 24, 2018). The statute "uses the term 'the disclosure statement' to refer to [the disclosure] documents provided *before* the extension of credit." Id. (emphasis added) (citing Evanto v. Fed. Nat. Mortg. Ass'n, 814 F.3d 1295, 1298 (11th Cir. 2016)); see also Signori v. Fed. Nat. Mortg. Ass'n, 934 F. Supp. 2d 1364, 1368 (S.D. Fla. 2013) ("[T]he TILA provisions are clear that the disclosure documents referred to in Section. . . 1641(e)(1) are documents generated in connection with the origination of the loan.").

Plaintiffs assert that, during the modification process, the servicer failed to satisfy its disclosure obligations under TILA because it did not include the "mandatory disclosures" with the terms of the modification, and did not clarify amounts, costs, or monthly payments due. [ECF No. 26 at 2–3]. Plaintiffs also complain that the Modification Agreement incorrectly stated that the interest rate would be lowered, when in fact, it was raised from 3.25% to 4%. [ECF No. 26 at 3]. Defendants argue that TILA did not require them to provide additional disclosure statements years after the 2005 home equity line of credit was taken out. While this may be a valid argument, it appears to miss the point. The Court interprets the TILA allegations in the complaint to relate to the 2012 modification, not the original 2005 line of credit. Specifically, Plaintiffs claim that TILA required Defendants to disclose the monthly amount that would be due under the 2012 Modification Agreement, and also other "amounts" and "costs," before the parties entered into the Modification Agreement, which Defendants did not do.

TILA does not necessarily treat a modification as a new transaction that triggers renewed

8

disclosure requirements. While the statute does not specifically address whether the modification of a home equity line of credit triggers additional disclosure requirements, it does allow a creditor to modify a term of a home equity line of credit if the "consumer specifically agrees to it in writing at that time," 12 C.F.R. § 226.5b(f)(3)(iii); this provision makes no mention of any additional disclosure requirements. TILA also specifically addresses mortgage modifications in a separate provision, but even if that provision were applicable here, the result would be the same. Courts have interpreted TILA not to impose new disclosure requirements for mortgage modifications as long as the modification supplements or modifies the terms of the original loan, as opposed to being a complete refinancing with all new terms. See Drake v. Ocwen Fin. Corp., No. 09-C-6114, 2010 WL 1910337, at *7–9 (N.D. Ill. May 6, 2010) (where modification agreement does not completely replace prior mortgage, consumer is not entitled to new TILA disclosures for that transaction); In re Sheppard, 299 B.R. 753, 761–64 (Bankr. E.D. Pa. 2003) (same, citing cases); In re Hart, 246 B.R. 709, 738 (Bankr. D. Mass. 2000) (mortgage modification was not a refinancing and thus did not trigger renewed TILA disclosure obligations). Here, the Modification Agreement clearly supplements the terms of the existing home equity line of credit, rather than replacing the original agreement. [ECF No. 21-5 at 2] ("all other terms and conditions of the original Note . . . shall remain in full force and effect"). Thus, because TILA allows the modification of the terms of a home equity line of credit without mandating additional disclosures, and because a creditor is not required to make additional disclosures where a mortgage is modified, Defendants were not obligated to make additional disclosures at the time that the home equity line of credit was modified. Accordingly, Plaintiffs have failed to state a claim for a violation of TILA.[7]

[7] A separate provision of TILA requires a creditor to correct billing errors, and sets forth a procedure for the obligor to notify the creditor of such errors. 15 U.S.C. § 1666. Plaintiffs do not

In addition, Ditech/Green Tree cannot be held liable for any disclosure violations under TILA, because TILA imposes disclosure requirements only on the creditor, not the servicer. 15 U.S.C. § 1641; see also Iroanyah v. Bank of Am., 753 F.3d 686, 688, n.2 (7th Cir. 2014) (explaining that servicer of loan "cannot be liable for damages under TILA").

2. RESPA Violations

RESPA requires loan servicers to respond to a "Qualified Written Request" ("QWR"). 12 U.S.C. § 2605(e)(1)(A). A QWR is a written request that identifies the name and the account of the borrower and describes the "reasons for the belief" that "the account is in error" or "provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B). The information sought through a QWR must relate to the servicing of a loan. 12 U.S.C. § 2605(e)(1)(A). "Servicing" of a loan includes "receiving any scheduled periodic payments from a borrower" or "the making of . . . payments of principal and interest and such other payments with respect to the amounts received from the borrower . . . ." 12 U.S.C. § 2605(i)(3). The definition of "'[s]ervicing' . . . does not include the transactions and circumstances surrounding a loan's origination—facts that would be relevant to a challenge to the validity of an underlying debt or the terms of a loan agreement." Medrano v. Flagstar Bank, FSB, 704 F.3d 661, 666–67 (9th Cir. 2012). The requirement that the QWR "must request information relating to servicing . . . ensures that the statutory duty to respond does not arise with respect to all inquiries or complaints from borrowers to servicers." Id. at 666.

---

invoke this provision, nor do they allege that they followed the required procedure for notifying the creditor of errors. Another section of TILA requires a creditor, assignee, or servicer to send the obligor a statement each billing cycle. 15 U.S.C. § 1638(f). Plaintiffs do not seem to claim that they did not receive statements; at one point, they state that they were "consistently" provided information about balances due. Rather, Plaintiffs' allegation appears to be that the information contained in the statements was incorrect.

10

Here, Plaintiffs allege that they sent QWRs to both the servicer, Ditech/Green Tree, and the assigned lender, Citizens. [ECF Nos. 26 at 4, 26-2 at 3–5, 7–9]. Since Citizens was not the servicer, it had no duty to respond. See, e.g., McAndrew v. Deutsche Bank Nat'l Trust Co., 977 F. Supp. 2d 440, 445–46 (M.D. Pa. 2013) (dismissing RESPA claim against owner of loan for failure to respond to QWR because it was not the servicer); Ford v. Saxon Mortg. Servs., Inc., No. CV-10-RRA-989-M, 2012 WL 2862035 (N.D. Ala. June 14, 2012) (dismissing RESPA claim against non-servicer defendants, including owner of loan); Beacham v. Bank of Am., N.A., No. 3:12-CV-0801-G (BF), 2012 WL 236219, at *2 (N.D. Ala. May 25, 2012) (dismissing RESPA claim against owner of loan), report and recommendation adopted, 2012 WL 2862036 (N.D. Ala. July 9, 2012).[8]

Plaintiffs filed a copy of a QWR that they sent to Green Tree and a QWR they sent to Citizens, both dated March 28, 2015. [ECF No. 26-2 at 3–5, 9].[9] Although Plaintiffs allege in their complaint that they sent QWRs "on more than four occasions over a four year period" [ECF No. 26 at 4], the dates the other QWRs were sent are not specified, nor have copies of the other letters been provided to the Court. In the QWRs that Plaintiffs did provide, they primarily requested documentation regarding the ownership of the note and any assignments that had been made, as well as demanding that the lender and servicer prove that they had legal authority to collect payments. [ECF No. 26-2 at 3–5, 9]. Plaintiffs also requested "copies of ALL documents related to the loan from the time of its creation, through to the present day," including the

---

[8] Plaintiffs have not alleged that Citizens is vicariously liable for any RESPA violation committed by Ditech/Green Tree. The First Circuit has not addressed the issue of vicarious liability under RESPA, and other courts are split. Bowen v. Ditech Fin. LLC, No. 2:16-CV-00195-JAW, 2017 WL 4158601, at *15 (D. Me. Sept. 19, 2017). A New Hampshire court has determined that vicarious liability does not exist under RESPA. Id. (citing Rouleau v. U.S. Bank N.A., No. 14-cv-568-JL, 2015 WL 1757104 (D.N.H. Apr. 17, 2015)).

[9] Plaintiffs provided two copies of the letter addressed to Green Tree; these appear to be duplicate copies of the same letter. [ECF No. 26-2 at 5, 9].

11

original note and "the accounting records of the loan in its entirety," and asked for specific information about what Plaintiffs refer to as "Corporate Advances" and "all references to 'insurance' and costs associated with insurance and/or taxes." Id. The complaint alleges that Defendants "failed to comply on all requests" made in the QWRs, but in the next sentence, Plaintiffs state that "[s]ome replies provided copies of monthly statements, some provided a spreadsheet accounting with amounts that made no sense and made no provisions for the assessed debited amounts." [ECF No. 26 at 4]. The Court interprets these statements to mean that Defendants did respond to the QWRs, but that Plaintiffs considered the responses to be insufficient. Plaintiffs have not stated when they received the responses, nor have they provided sufficient detail as to the content of the responses or why they were lacking.

First, because the complaint is unclear as to whether Defendants responded to all or only some of Plaintiffs' letters and does not adequately explain how any responses were deficient under RESPA, Plaintiffs have not stated a claim for a RESPA violation. See Gutierrez v. PNC Mortgage, No. 10-cv-01770, 2012 WL 1033063, at *8 (S.D. Cal. Mar. 26, 2012) ("Without alleging more, the simple assertion that Defendants failed to comply with the statute is not enough."); Mantz v. Wells Fargo Bank, N.A., No. 09-12010-JTL, 2011 WL 196915, at *4 (D. Mass. Jan. 19, 2011) (to state claim under RESPA, plaintiff must explain, inter alia, "how the defendant failed to respond to the request"); Delino v. Platinum Cmty. Bank, 628 F. Supp. 2d 1226, 1232 (S.D. Cal. 2009) (mere allegation that defendants "fail[ed] to respond to Plaintiff's QWR" insufficient to state a claim under RESPA).

Next, most of the information sought by Plaintiffs through their purported QWRs is not documentation covered by the statute.[10] The information sought through a QWR must relate to

---

[10] The Court notes that Plaintiffs' letters contained a broad request for "all" loan documentation, including "the accounting records of the loan in its entirety," which ostensibly included

12

the servicing of a loan. 12 U.S.C. § 2605(e)(1)(A). Information concerning the ownership of the loan, the original promissory note, or any assignments of the mortgage does not relate to the servicing of the loan. See e.g., Poindexter v. Mercedes-Benz Credit Corp., 792 F.3d 406, 413 (4th Cir. 2015) (explaining that statutory definition of "servicing" "does not include the transactions and circumstances surrounding a loan's origination" (quoting Medrano, 704 F.3d at 666–67); Helman v. Udren Law Offices, P.C., 85 F. Supp. 3d 1319, 1331 (S.D. Fla. 2014) (letters that requested copies of documents and proof of transfer of the loan but did not pertain to servicing or explain why the loan was in error did not constitute a QWR); Ward v. Sec. Atl. Mortg. Elec. Registration Sys., Inc., 858 F. Supp. 2d 561, 574 (E.D.N.C. 2012) (letter seeking, inter alia, copies of loan documents, promissory note, and loan transactional history was not a QWR); Junod v. Dream House Mortg. Co., No. CV 11-7035-ODW VBKX, 2012 WL 94355, at *3–4 (C.D. Cal. Jan. 5, 2012) (letter requesting, inter alia, copy of promissory note, loan transactional history, MERS Milestone Reports, and information concerning holder of note were "not the type of information RESPA contemplates" and therefore, did not constitute a QWR).[11] Moreover, to the extent that Plaintiffs seek to challenge the validity of the loan or to dispute its terms, a QWR is not the appropriate mechanism to do so and correspondence in that vein does not qualify as a QWR. See Medrano, 704 F.3d at 667 (holding that "letters challenging only a

---

documents relating to servicing, such as monthly statements. At the same time, Plaintiffs acknowledged that they received copies of statements and an accounting of the loan. [ECF No. 26 at 4]. Thus, on the current record, the Court cannot conclude that Plaintiffs have stated a claim that Ditech/Green Tree violated RESPA by failing to disclose this type of information.
[11] RESPA does require a servicer to respond "to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan." 12 U.S.C. § 2605(k)(1)(D). Here, however, Plaintiffs do not allege that they requested contact information for Citizens, the owner of the loan, and in fact, it appears that they were in possession of that information and used it to send letters to Citizens. Instead, Plaintiffs requested a copy of the original note, information about prior assignments of the note, and "validation" of the debt, which is outside the scope of section 2605(k)(1)(D).

13

loan's validity or its terms are not qualified written requests that give rise to a duty to respond under" the relevant provision of RESPA); Perron ex rel. Jackson v. J.P. Morgan Chase Bank, N.A., 845 F.3d 852, 857 (7th Cir. 2017) (explaining that a QWR cannot "be used to collect information about, or allege an error in, the underlying mortgage loan" (citing Medrano, 704 F.3d at 667–67)).[12] To the extent that Plaintiffs' letters focused on obtaining information concerning the validity of the note, assignments, and the right to collect on the debt, the letters did not satisfy the statutory criteria for QWRs, and Ditech/Green Tree therefore had no obligation under RESPA to respond.

Further, even if Plaintiffs could demonstrate that the servicer failed to respond to a valid QWR, they must also demonstrate that they "incurred actual damages as a consequence of the servicer's failure." Foregger v. Residential Credit Sols., Inc., No. 12-11914-FDS, 2013 WL 6388665, at *4 (D. Mass. Dec. 5, 2013). "In order to plead 'actual damages' sufficiently, a plaintiff must allege specific damages and identify how the purported RESPA violations caused those damages." Id. Plaintiffs state that damages would be "hard to measure," but that is not enough to plead damages resulting from a RESPA violation. See, e.g., Saade v. Pennymac Loan Servs., LLC, No. 15-12275-IT, 2016 WL 4582083, at *8–9 (D. Mass. Aug. 31, 2016) (plaintiff failed to state claim under RESPA because "damages [were] not properly alleged"). When Plaintiffs "[allege] a breach of RESPA duties alone without alleging actual damages and the proximate cause of the breach of duty to those damages, [they] fail to state a RESPA claim." Hutchinson v. Del. Sav. Bank, FSB, 410 F. Supp. 2d 374, 383 (D.N.J. 2006) (citing 12 U.S.C. §

---

[12] Similarly, RESPA does not require the servicer to respond to any loan modification request contained in a purported QWR. See, e.g., Mbakpuo v. Civil Wells Fargo Bank, N.A., No. RWT-13-2213, 2015 WL 4485504, at *8 (D. Md. July 21, 2015) (letter disputing denial of request for modification did not relate to servicing of loan as defined by RESPA); Van Egmond v. Wells Fargo Home Mortg., No. SACV 12-0112 DOC, 2012 WL 1033281, at *4 (C.D. Cal. Mar. 21, 2012) (same).

14

2605(f)(1)(A)). Because Plaintiffs have not provided a sufficiently detailed explanation concerning their damages or how the damages they claim to have suffered were connected to the alleged RESPA violations, they have failed to state a claim under RESPA.

3. FDCPA Violations

The FDCPA was enacted to protect consumers from abusive debt collection practices. 15 U.S.C. § 1692(e). "The statute creates a private cause of action against 'any debt collector.'" Dean v. Compass Receivables Mgmt. Corp., 148 F. Supp. 2d 116, 118 (D. Mass. 2001) (quoting 15 U.S.C. § 1692k). To bring a claim against a particular defendant, that defendant must be a "debt collector," and the communication at issue must have been made "in connection with the collection of any debt." Stagikas v. Saxon Mortg. Servs., Inc., 795 F. Supp. 2d 129, 138 (D. Mass. 2011); see also 15 U.S.C. §§ 1692a(6), 1692c(a)–(b). Therefore, a viable claim for violation of the FDCPA requires that a plaintiff establish: "(1) that [the plaintiff] was the object of collection activity arising from consumer debt, (2) [that] defendants are debt collectors as defined by the FDCPA, and (3) [that] defendants engaged in an act or omission prohibited by the FDCPA." O'Connor v. Nantucket Bank, 992 F. Supp. 2d 24, 30–31 (D. Mass. 2014) (internal quotations and citations omitted).

Here, Plaintiffs have not established that Ditech/Green Tree is a "debt collector" as defined by the FDCPA. Under the FDCPA, for an entity to qualify as a "debt collector," the debt at issue must have been in default at the time it was obtained by that entity. 15 U.S.C. § 1692a(6)(F)(iii). A failure to plead that the debt was in default at the time the defendant began servicing the loan is fatal to the claim. See, e.g., Crepeau, 2011 WL 6937508, at *5 (dismissing claim under FDCPA where plaintiff failed to allege that loan was in default when defendant began servicing it); Fogle v. Wilmington Fin., No. 08-cv-388-JD, 2011 WL 90229, at *2 (D.

15

N.H. Jan. 11, 2011) (same).[13]

Here, Plaintiffs have not pleaded that the loan was in default at the time that servicing rights were transferred to Ditech/Green Tree, and the complaint does not provide sufficient detail to allow the Court to infer that the loan was in default when it was transferred. A letter attached to the complaint indicates that servicing rights were transferred to Green Tree on August 25, 2010. [ECF No. 26-2 at 49]. Plaintiffs allege that once the loan's initial "draw period" was over and they were required to begin making payments toward principal and interest, they nonetheless sent only partial, "interest only" payments. [ECF No. 26-1 at 1]. They state that this occurred in the "fifth year" of the home equity loan, which originated in June 2005, but they do not identify any specific or approximate dates as to when the draw period ended or when they began making the partial payments. Id.; [ECF No. 26 at 1]. Attached to the complaint, however, is a letter from Plaintiffs to the Massachusetts Attorney General stating that "the note became due as a principal and interest payment" in November 2010. [ECF No. 26-1 at 11]. Thus, based on the allegations and information provided by Plaintiffs, it appears that the earliest date that the loan could have been in default was November 2010, which was three months after servicing rights were transferred to Ditech/Green Tree. Accordingly, Plaintiffs have not alleged that Ditech/Green Tree was a "debt collector" as defined by the FDCPA.

Furthermore, even if Ditech/Green Tree did meet the definition of a debt collector,

---

[13] "The FDCPA does not provide a definition of default." Skerry v. Mass. Higher Educ. Assistance Corp., 73 F. Supp. 2d 47, 51 (D. Mass. 1999). The fact that a debtor has fallen behind on payments does not necessarily mean that the loan is in default. Alibrandi v. Fin. Outsourcing Servs., Inc., 333 F.3d 82, 86 (2d Cir. 2003). To determine whether a debt is in default, courts "look to any underlying contracts . . . governing the debt at issue." Dionne v. Fed. Nat'l Mortg. Ass'n, No. 15-cv-56-LM, 2016 WL 6892465, at *11 (D.N.H. Nov. 21, 2016) (quoting De Dios v. Int'l Realty & Invs., 641 F.3d 1071, 1074 (9th Cir. 2011)). In this case, the home equity loan agreement states that Plaintiffs "will be in default if . . . any payment required by the Agreement or this Mortgage is not made when it is due." [ECF No. 21-2 at 6].

Plaintiffs have still failed to state a claim for a FDCPA violation. The FDCPA prohibits the use of "any false, deceptive or misleading representation" in connection with the collection of a debt. 15 U.S.C. § 1692(e)(10). Courts evaluate whether a collection practice violates the FDCPA based on whether an objective, "least sophisticated debtor" would find the practice threatening or misleading. See Martin v. Sands, 62 F. Supp. 2d 196, 199 (D. Mass. 1999). This standard is considered to be "low." In re Hart, 246 B.R. 709, 730 (Bankr. D. Mass. 2000) (quoting Avila v. Rubin, 84 F.3d 222, 226 (7th Cir. 1996)). In this case, Plaintiffs have not identified or described which particular statement they believe to be "false, deceptive, or misleading," nor have they provided a copy of any documents they contend include misleading information. Instead, Plaintiffs allege generally that Defendants "misrepresent[ed] the amount" owed, "or" that Defendants "inflat[ed] the amount" and did "not provid[e] a proper accounting," which thus "held the Plaintiffs to an inflated debt." [ECF No. 26 at 7–8]. Without more detail, this allegation is not sufficient to indicate that Defendants violated the FDCPA, nor does it provide Defendants with sufficient notice to defend against the claim. Cf. Dolan v. Schreiber & Assocs., P.C., No. 01-10177-MLW, 2002 U.S. Dist. LEXIS 6005, at *11–13 (D. Mass. Mar. 29, 2002) (plaintiffs stated FDCPA claim where complaint identified sentence in letter alleged to be false and misleading). Accordingly, Plaintiffs have failed to state a claim for a FDCPA violation, and the claim must be dismissed.

Lastly, although it is unclear whether Plaintiffs intended to bring their FDCPA claim against Citizens, any such claim would also be dismissed. The FDCPA applies only to a "debt collector," not the creditor. See 15 U.S.C. § 1692 et seq.; Moss v. Ditech Fin., LLC, No. PWG-15-2065, 2016 WL 4077719, at *4 (D. Md. Aug. 1, 2016) (owner of loan was a "creditor" not a "debt collector" under the FDCPA where it acquired the loan for its own account instead of on

the behalf of others). Citizens, the current holder of the note and mortgage, retained Ditech/Green Tree to collect the debt on its behalf. [ECF No. 21 at 14]. Because Citizens is not itself attempting to collect a debt owed to another, Plaintiffs may not bring a FDCPA claim against Citizens.[14]

## III. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs included a request for a preliminary injunction in their Second Amended Complaint. [ECF No. 26]. To evaluate whether Plaintiffs are entitled to a preliminary injunction, the Court must analyze four factors: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (internal quotation marks omitted). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." Id. "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he [or she] is likely to succeed in his [or her] quest, the remaining factors become matters of idle curiosity." Id. (internal quotation marks and citation omitted). Here, Plaintiffs have not shown that they are likely to succeed on the merits of their claim, for the reasons discussed supra. Therefore, they are not entitled to a preliminary injunction.

---

[14] To the extent that Plaintiffs attempt to bring a claim for the breach of quiet enjoyment, that claim fails. The covenant of quiet enjoyment concerns a duty that a landlord owes to a tenant of a rental property. See, e.g., Simon v. Solomon, 431 N.E.2d 556, 564–65 (Mass. 1982). The concept is not applicable here.

18

## IV. CONCLUSION

Accordingly, the motion for leave to file a Second Amended Complaint [ECF No. 22] is GRANTED, and the motion to dismiss [ECF No. 21] is GRANTED. Plaintiffs' motion for a preliminary injunction [ECF No. 26] is DENIED.

**SO ORDERED.**

March 7, 2018

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE